## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF MICHIGAN

GREGORY LYNN and
  PAULETTE HAMILTON,
  on behalf of the UNITED STATES
  OF AMERICA

              Plaintiffs/Relators,                Case No.

vs.                                      Hon.

                                          FILED UNDER SEAL
CITY OF DETROIT                 31 U.S.C. §§ 3729-32
                                        JURY TRIAL DEMANDED
              Defendant.
_____/

I.A.B. Attorneys At Law, PLLC
Felicia Duncan Brock (P63352)
Tracy G. Smith (P74572)
*Attorneys for Plaintiffs/Relators*
25447 Plymouth Road
Redford, Michigan 48239
(313) 318-3180
(313) 766-4732 (fax)
Duncan@iabattorneys.com

_____/

## ***QUI TAM* COMPLAINT**

1.      This is an action by *qui tam* Relators Gregory Lynn and Paulette Hamilton, on behalf of the United States against Defendant City of Detroit to recover penalties and damages arising from false statements, assurances and certifications Defendant made for the sole purpose of securing federal monies allocated to the states/municipalities pursuant to 49 U.S.C. § 5101 et. seq.

## PARTIES

2.      Relator Gregory Lynn ("Lynn") is a citizen of the State of Michigan; and the Operations Manager for Enjoi Transportation, LLC—a Michigan Company located within the City of Detroit.

3.      Relator Paulette Hamilton ("Hamilton") is a citizen of the State of Michigan; and the sole Member of Enjoi Transportation, LLC.

4.      Defendant City of Detroit ("City") is a Municipal Corporation acting in the County of Wayne, State of Michigan.

## JURISDICTION AND VENUE

5.      The jurisdiction of this court is invoked pursuant to the provisions of 31 U.S.C. §3732(a) (False Claims Act) and 28 U.S.C. § 1331 (Federal Question).

6.      Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) because (1) Defendant resides in this district; (ii) Defendant transacts municipal business in this district and did so at all times relevant to this complaint; and, as asserted below, (iii) Defendant committed acts proscribed by 28 U.S.C. § 3729—acts giving rise to this action—within this district.

7.      Lynn and Hamilton are the original sources of, and have direct and independent knowledge of, all publicly disclosed information on which any allegations herein might be deemed based, and has voluntarily provided such information to the Government before filing this action.

8.      Specific disclosures to the Government include numerous written communications, including emails, City Council videos, Financial Review Commission documents, RFPs, RFP bids, RFP bid evaluations and news article, among other things.

## FACTUAL ALLEGATIONS

## A.      BACKGROUND

9.     One of the many departments within Defendant City is the Department of Transportation ("DDOT").

10.    Since 2014, Dan Dirks has served as the DDOT Director.  This is a mayoral, appointed position with Defendant City.

11.    Defendant City and specifically DDOT receives FTA funds averaging $20,000,000 per year as operating funds and $9,000,000 per year as capital funds.

12.    These amounts were received each year including 2015, 2016 and 2017.

**ASSURANCES**

13.    Every year, as a prerequisite to obtaining FTA funding, Defendant City must provide the federal government with certain assurances.

14.    Specifically, every year the Certifications and Assurances state:

> Except as the Federal Transit Administration (FTA or We) determines otherwise in writing, before FTA may award Federal transit assistance (funding or funds) in the form of a Federal Grant, Cooperative Agreement, Loan, Line of credit, or Loan Guarantee to Support a public transportation Project, an Authorized Representative (You) of the Project Sponsor (Applicant) must select certain Certifications and Assurances required by Federal law or regulation.

15.    Certifications and assurances Group 3—Procurement and Procurement Systems— requests that any Applicant applying for FTA funding, "especially if your Applicant is a State, local, or Indian tribal government . . . ." certify to following FTA procurement rules and regulations.

16.    The applicant, and in this instance Defendant City, when initialing this particular certification agrees:

> On behalf of your Applicant, you certify that its procurements and its procurement system will comply with all Federal laws and regulations in

accordance with applicable Federal guidance, except to the extent FTA has approved otherwise in writing.

17.     In 2015, 2016 and 2017, Defendant City, in an effort to receive federal funding for its transportation projects, in particular certified that it would comply with the FTA specified procurement and procurement systems.

18.     Most important here, on December 22, 2014, May 11, 2016 and April 7, 2017, Dirks signed swearing that all certifications and assurances made therein were true and accurate.

19.     In fact, Dirks made this representation "under penalties of perjury". . . .

20.     In addition, Dirks agreed and understood that the "FTA intends that the Certifications and Assurances the Applicant selects on the other side of this document should apply to each Award for which it now seeks, or may later seek federal assistance to be awarded during federal fiscal year[s]" 2015, 2016 and 2017.

21.     According to the Federal Register, the yearly Certifications and Assurances a representative makes are binding on the applicant.

22.     Also, the representative's commitments "remain in effect until its Award is closed or the end of the useful life of its federally assisted assets, whichever is later."

**B.      FTA PROCUREMENT RULES AND REGULATIONS**

23.     FTA C 4220.1F—Third Party Contracting Guidance provides guidance as to the required procurement process.

24.     Specifically, the Circular "provides contracting guidance for recipients of Federal assistance awarded by the Federal Transit Administration (FTA) when using that Federal assistance to finance its procurements (third party contracts)."

4

25.     Among other things, the guidance provides that, "the Common Grant Rules require a recipient of Federal assistance to use third party procurement procedures that provide full and open competition."

26.     The Circular identifies 49 U.S.C. Section 5325(a) as the statutory authority for the open competition procurement requirement.

27.     Organizational conflicts of interest are also prohibited.

> 28. "An organizational conflict of interest occurs when any of the following circumstances arise:
>
> a Lack of Impartiality or Impaired Objectivity.  When the contractor is unable, or potentially unable, to provide impartial and objective assistance or advice to the recipient due to other activities, relationships, contracts, or circumstances.
>
> b Unequal Access to Information.  The contractor has an unfair competitive advantage through obtaining access to nonpublic information during the performance of an earlier contract.
>
> c Biased Ground Rules.  During the conduct of an earlier procurement, the contractor has established the ground rules for a future procurement by developing specifications, evaluation factors, or similar documents.

28.     The Federal Acquisition Regulation—Subpart 9.5 Organizational and Consultant Conflicts of Interest sheds some additional light on the definition of organizational conflict of interest.

29.     The Federal Acquisition Regulation attempts to prevent unfair competitive advantage in bidding processes.  9.505(b).

30.     Specifically relevant here, "an unfair competitive advantage exists where a contractor competing for award of any Federal contract possesses. (1) Proprietary information that was obtained from a Government official without proper authorization; or (2) Source selection

information (as defined in 2.101) that is relevant to the contract but is not available to all competitors, and such information would assist that contractor in obtaining the contract."

31.     Not to be overlooked, FTA C 42201E—Third Party Contracting Requirements "sets forth the requirements a grantee must adhere to in the solicitation, award and administration of its third party contracts."

32.     Herein, the FTA further specifies and clarifies its competition requirement.

33.     "All procurement transactions will be conducted in a manner providing full and open competition."

34.     The Circular continues:

> Some situations considered to be restrictive of competition include, but are not limited to:
>
> (3)  Noncompetitive pricing practices between firms or between affiliated companies;
>
> (4)  Noncompetitive awards to any person or firm on retainer contracts;
>
> (5)  Organizational conflicts of interest.  An organizational conflict of interest means that because of other activities, relationships, or contracts, a contractor is unable, or potentially unable, to render impartial assistance or advice to the grantee; a contractor's objectivity in performing the contract work is or might be otherwise impaired; or a contractor has an unfair competitive advantage; . . . .
>
> Among other things.

35.     Most notably, Defendant City, through the direct representations of DDOT Director Dan Dirks agreed to adhere to all of the above procurement rules and regulations, among others.

## C.     DEFENDANT CITY'S PROCUREMENT AND CONTRACTS

36.     Important here, under Title VI of the Civil Rights Act of 1964, any entity that receives funding directly from the FTA must refrain from discrimination based on any protected class.

37.     To that end, DDOT (a recipient of FTA funding) provides complementary paratransit service to any qualifying individual with a disability as a required transit service accommodation under the ADA.

38.     Such complementary services are provided when qualifying individuals are unable to use regular fixed route buses to meet their needs.

39.     After being deemed eligible the individual can, under certain conditions, contact the DDOT to request a paratransit bus pick-up from a location and request transport to a desired destination.

40.     Enjoi, under the ownership, operation and control of Lynn and Hamilton, for nearly 10 years, has been by far the largest provider of paratransit transportation services for the City.

**RFP 50439**

41.     On April 16, 2015, the City issued RFP#50439—Supplier Managed Para Transit Service.

42.     The RFP was for providing the paratransit services, as well as for managing the call center where individuals call to request the transit service, among other things.

43.     In issuing RFP 50439, the City was seeking to outsource management of paratransit transportation services to one vendor.

44.     These services to be outsourced included dispatching, call center operations, management of transportation services providers, as well as other paratransit services.

45.     In response to RFP 50439, on May 13, 2015, Transdev Services, Inc. ("Transdev") submitted a proposal.

46.     Most notably, although Transdev registered with the State of Michigan as a Foreign Profit Corporation on March 1, 2007; the corporation did not have a physical presence (i.e.

offices, personnel, contracts, etc.) prior to being awarded this paratransit contract with the City of Detroit.

47.     In addition to Transdev, at least four other businesses submitted proposals.

48.     Notably, MV Transportation ("MV") also timely submitted a proposal.

49.     Key here, Transdev hired Martin Moore as its General Manager—effective immediately following its being awarded the paratransit management contract.

50.     Moore was awarded this position in spite of the fact that he had limited experience working at this level of upper management.

51.     Not to be overlooked, Moore and Dirks had a prior relationship/friendship that neither disclosed during the bid process or at any later time.

52.     Moore retired from SMART after more than 30 years of employment.  His final position upon retirement was Manager of Connector Services & Central Dispatch.

53.     In his 30 year SMART career, he served as the Acting Director of Transportation on a temporary basis—a matter of months.

54.     Prior to being appointed as the DDOT Director, Dirks served as the SMART General Manager for nearly 10 years.

55.     As such, Dirks worked directly with Moore.

56.     On March 22, 2017, Relator Lynn lodged an ethics complaint with the City of Detroit's ethics department.

57.     The complaint included reference to there being a conflict of interest in the proposal evaluation process for RFP 50439.

58.     As a result of the investigation, Lynn became aware that Dirks admitted in both a verbal interview and in writing that between April 2015, and May 2015, he referred Moore to Transdev for the General Manager position before Transdev was awarded the contract.

59.     In fact, Dirks' recommendation was made just before Transdev submitted its proposal.

60.     Notably, on February 25, 2016, Moore resigned his two year position with the Detroit Area Agency on the Aging where he was employed as its Transportation Manager.

61.     Noted, Moore's position with Transdev was contingent upon it receiving the Contract.

62.     Nevertheless, Moore was included in Transdev's proposal as a key employee acting as General Manager for the paratransit Contract.

63.     Transdev's hiring of Moore, who Dirks recommended, gave Transdev an unfair competitive advantage over the other bidders.

64.     Lynn also became aware that Dirks' recommendation of Moore during the procurement process was a violation of Defendant City's written procurement policies.

65.     Lynn shared his findings with his wife, Relator Hamilton.

66.     Defendant City's procurement policies forbid City employees from maintaining any contact with potential bidders and/or bidders once it is known that a RFP for services will be issued.

67.     Most astounding, Dirks was not only the DDOT Director, he was one of the members of the evaluation team for RFP 50439.

68.     Transdev was awarded the Contract.

69.     Prior to the Contract becoming active, Defendant City's Council had to approve.

70.     On February 15, 2016, at a City Council meeting, Defendant City's Procurement Director Boysie Jackson, along with Dirk, repeatedly informed the Council Members that the contract was competitively bid and that Transdev was the lowest bidder.

71.     Again, on February 18, 2016, Jackson informed the Financial Review Commission[1] Members that RFP 50439/Contract No. 2916016 was competitively bid; and that it was awarded to the lowest bidder.

72.     At the time that he made these representations, Jackson was aware that the Contract was not competitively bid; and most certainly that Transdev was not the lowest bidder.

73.     In fact, Defendant City's Evaluation II—Post Site Visit indicates that Transdev's pricing for services was $22.09/ambulatory trip; $25.11/non ambulatory trip; and $1.87 mil for call center.

74.     MV's pricing for services was $21.07/ambulatory trip; $23.94/non ambulatory trip; and 1.379 mil for call center.

75.     Clearly, MV's pricing was lower than Transdev's.

76.     Worth also noting, Transdev and MV both provided documentation within their proposal indicating that they would utilize the call center and personnel previously servicing paratrans; and all of the same providers.

77.     As such, outside of price and the key personnel, there was little difference between the two proposals.

78.     Defendant City's Evaluation II—Post Site Visit also indicated that "Transdev's key personnell [sic] idendified [sic] to manage COD Paratransit system, and support program ramp up, is were [sic] very familiar with the SE Michigan and the Detroit area."

---

[1] The Financial Review Commission is a State mandated commission in place to review Defendant City's financial and/or contracting decisions in lieu of an Emergency Manager.

79.     Without dispute, it was the hiring of Moore that caused Defendant City to award the Contract to a higher bidder.

80.     Attention should be given to the fact that in or about 2010, Defendant City purchased vans specifically for paratrans providers.

81.     FTA funds were used in the purchase of these vans.

82.     The lifetime for these vans is about 8 years; and in fact, these vans remain in service and are providing paratrans services.

83.     Per the FTA, Defendant City's commitment to adhere to the FTA procurement rules extends until end of the useful life of its federally assisted assets—the paratrans vans.

**RFP 16PC533**

84.     On August 26, 2016, Defendant City issued what began as RFP 15PC533.  As time transpired, the bid number was changed to RFP 16PC533.

85.     The RFP sought transportation providers to perform New Freedom transportation services to meet the transportation needs of people with disabilities for residents of the city of Detroit, Highland Park and Hamtramck.

86.     The target population benefiting from this Contract were/are individuals who, because of illness, injury, age, congenital malfunction, or other incapacity or temporary or permanent disability (including an individual who is a wheelchair user or has semi-ambulatory capability), cannot use effectively, without special facilities, planning, or design, public transportation service or a public transportation facility.

87.     The New Freedom Contract is 80% funded with FTA funds.  Such 80% is $3,613,430 over the contract's three year term; or $1,205,934 per year.

88.     Notably, federal funding is implicated in the RFP's requirement that 5% of the subcontractors utilized under the contract have a Disadvantaged Business Enterprise (DBE) firm certification.

89.     In November 2016, Transdev was awarded the New Freedom Contract.

90.     Specifically, Transdev was awarded the contract to provide reservations, scheduling and dispatch services for New Freedom.

91.     Notably, the City of Detroit's portion of the New Freedom Contract was valued as $397,568.25 from December 1, 2016 through November 30, 2019.

92.     Worth restating, 80% of the funds for this contract or $1,205,934 per year were federal funds.

93.     Continuing the pattern of exploiting an unfair advantage, the awarding of the New Freedom Contract was due to the relationship between Dirks, an evaluation team member, and Moore—Dirks' recommended General Manager.

94.     Yet again, Defendant's agents Dirks and Jackson represented to the Detroit City Council and the Financial Review Commission that the contract was competitively bid.

95.     Dirks, as part of the evaluation team for the contract, steered the contract to the employer of his friend—who was not the lowest bidder.

96.     After awarding the contract to Transdev, in November 2016, Defendant confirmed that the U.S. Department of Transportation awarded it funds in the amount of $2,347,863 for "the implementation of a centralized Mobility Management Program and the purchase of miscellaneous support equipment;" and "support operational costs for the Mobility Management Program. Transportation programs include Life support, Ride-Share and Grab-A-Cab service", all under the program title of New Freedom.

97.     In awarding this second contract in less than a year to Transdev, Defendant continues the pattern of exploiting an unfair competitive advantage.

### COUNT I
**Federal False Claims Act**
**31 U.S.C. §§ 3729(a)(1)(A) and (a)(2)**

98.     Relators reallege and hereby incorporate Paragraphs 1-97 by reference as if fully restated herein.

99.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et. seq*., as amended.

100.    By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent certifications, and as such false claims, to the United States Government for obtaining FTA and/or other federal funding.

101.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false records, statements and/or required assurances to induce the Government to approve its FTA and/or other funding requests.

102.    Specifically, December 22, 2014, May 11, 2016 and April 7, 2017, Defendant certified—as required to obtain FTA and/or other funding for its programs—that it would comply with the FTA specified procurement policies and procurement systems.

103.    Important, these assurances were made before, after and during the period of time that Defendant's agent was actively violating those policies.

104.    In fact, Defendant's agent Dan Dirks violated the FTA procurement policies and procurement systems between April 2015 and May 2015 when he referred his friend Martin Moore for the General Manager position with Transdev.

105.    Defendant then, after Moore was hired, awarded two contracts to Transdev.

106.    In awarding these contracts, Defendant, via Jackson and Dirks, represented to the City of Detroit City Council and the Financial Review Commission that the contracts were competitively bid and awarded.

107.    Defendant's agents never admitted, until the ethics investigation, that it had violated the FTA procurement policies and procurement systems by recommending the hiring of key personnel prior to the submission of a bid; assured through a presence on the selection commission that the bidder was awarded the contracts; and misrepresented the competitive nature of the bid process.

108.    Without dispute, the New Freedom Contract was 80% funded with FTA funds.

109.    As such, the Government awarded Defendant $3,613,430 over three years, beginning in 2016.

110.    For this reason, the Government is entitled to the return of $1,205,934 for each year that FTA funds are utilized on this contract.

111.    As of the filing of this Complaint, the Government is entitled to no less than $1,205,934.

112.    The funding requests made in violation of Defendant's required assurances were based on false claims/certifications, and as such violate the False Claims act and no further express or implied false statement is required to render such infected claims/certifications false, and none can wash the claim/certifications clean.

113.    Defendant violated the False Claims Act by submitting, or causing to be submitted, claims for FTA funding based on false certifications/assurances.

114.    Further, annual requests for funding of the New Freedom Contract, which is based on the false certifications, constitute additional false certifications and as such additional false claims in violation of the False Claims Act.

115.    Relators cannot at this time identify all of the false claims/certifications for funding that Defendant's conduct caused; nor can they specifically quantify the entire amount the Government is entitled to have returned from the New Freedom contract.

116.    The Government, unaware of the falsity of Defendant's assurances; Defendant's violation of the FTA procurement policies and procurement systems; and Defendant's overall misconduct in the awarding of multiple contracts—two of which are undisputedly federally funded, awarded and continues to award FTA and/or other federal funding to Defendant for these contracts.

117.    Most notably, the Government would not have provided the FTA and/or other federal funding without Defendant's false certifications/assurances.

118.    By reason of Defendant's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.  At a minimum, the Government has already provided, and is entitled to the return of, $1,205,934.

119.    With Dirks and Jackson as high level (Director) management and agents of Defendant, all of Defendant's conduct as described in this Complaint was knowing, as that term is used in the False Claims Act.

WHEREFORE, *qui tam* Relators request that this Court enter judgment against Defendant for the following relief:

a.      that Defendant ceases and desists from violating 31 U.S.C. § 3729 *et. seq.*;

b.      that this Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained because of Defendant's actions, plus a civil penalty of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

c.      that *qui tam* Relators be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

d.      that the *qui tam* Relators be awarded all costs of this action, including attorneys' fees and expenses;

e.     that the Government withhold funds utilized for funding Defendant contracts with Transdev;

f.     that all Relators recover such other relief as the Court deems just and proper.

Respectfully,

I.A.B. Attorneys At Law, PLLC

By:  /s/ Felicia Duncan Brock
          Felicia Duncan Brock (P63352)
          Attorney for Plaintiffs/Relators
          25447 Plymouth Road
          Redford, Michigan 48239
          (313) 318-3180

Dated:  December 27, 2017

## JURY DEMAND

Qui Tam Relators demand a jury trial.

I.A.B. Attorneys At Law, PLLC

By:   /s/ Felicia Duncan Brock
          Felicia Duncan Brock (P63352)
          Attorney for Plaintiff/Relators
          25447 Plymouth Road
          Redford, Michigan 48239
          (313) 318-3180

Dated:  December 27, 2017